IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Mildred B. Geter, ) | |
| ) | Civil Action No. 3:13-1506-TLW-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Shakespeare Company LLC , ) | |
| ) | |
| Defendant. ) | |
| ) | |

      This matter is before the court on the defendant's motion for summary judgment. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

      The plaintiff, an African American female, filed this action on June 3, 2013, against her former employer. On April 21, 2014, the defendant filed a motion for summary judgment (doc. 18). The plaintiff, who is represented by counsel, did not file a response in opposition. The plaintiff's amended complaint (doc. 5) generally references several statutes: Title VII of the Civil Rights Act of 1964, as amended; the Equal Pay Act; and 42 U.S.C. §§1981 and 1988 (*id.*, amended comp. ¶ 2). In six paragraphs titled "VII. Personal Harm and Discriminatory Conduct," she makes claims of "disparate terms and conditions," "harass[ment]," "disparate treatment," "retaliation," and "hostile work environment" (*id.* ¶¶ 19-24). Giving the broadest possible reading to the plaintiff's allegations, there are four claims, all of them based upon her race: discriminatory transfer and discharge; disparate treatment in pay and training; hostile work environment harassment; and retaliatory discharge based upon the filing of a charge of race discrimination.

## **FACTS PRESENTED**

The defendant manufactures marine and military antennas, custom resins, string trimmer line, and custom monofilaments in its main facility in Columbia, South Carolina ("Shakespeare Road facility") (doc. 18-1, Propst aff. ¶ 2). During the 11 months that the plaintiff was employed by the defendant, she reported to Erik Drotleff, Distribution Manager. Mr. Drotleff reported to Grady Martin, Director of Supply Chain, and Mr. Martin reported to Dale Sexton, Vice President of Operations, who was responsible for the management of all manufacturing and distribution operations at the facility (*id.*, Propst aff. ¶ 5.)

The defendant hired the plaintiff on September 12, 2011, as a Shipping Clerk II at the North Springs warehouse. The plaintiff and her team leader Victor Serna were the only employees assigned to North Springs. Elaine Belch was the shipping clerk at the Consumer Products warehouse. Bridgett Ransom was the shipping clerk at Westmore warehouse. The shipping clerks were three of approximately 20 employees involved in distribution who reported to Mr. Drotleff (*id.*, Propst aff. ¶¶ 7- 8).

On February 11, 2012, the defendant closed the North Springs warehouse and transferred the plaintiff to the Shakespeare Road facility (*id.*, Propst aff. ¶¶ 10 & 12). Mr. Drotleff planned to have the consumer products shipping clerk, Ms. Belch, train the plaintiff in the consumer products shipping business. After being trained, the plaintiff would become the shipping clerk at that warehouse (doc. 18-2, Drotleff aff. ¶ 9). Once North Springs was closed, the plan was to terminate the shipping clerk, Ms. Ransom, at the Westmore warehouse. Ms. Belch would then be transferred to Westmore (after training the plaintiff), and the plaintiff would remain as the shipping clerk in the consumer products warehouse (*id.*, Drotleff aff. ¶¶ 9, 13, 21).

The defendant has presented evidence of the following incidents of misbehavior and shipping errors by the plaintiff along with the defendant's attempts at corrective action:

● On Saturday, February 11, 2012, the plaintiff and co-worker Bennie Jaynes got into a verbal dispute (doc. 18-2, Drotleff aff. ¶ 11). Mr. Jaynes reported to Mr. Drotleff that the plaintiff, among other things, told him "I ain't your (N' word)," and that "she would love for someone to fire her," and then she "shot [him] the middle finger" (doc. 18-4, Jaynes aff. ¶¶ 4-7 & ex. A; doc. 10-2, Drotleff aff. ¶ 12, exs. A, B). Mr. Drotleff decided to "let things cool down" and then he spoke to the plaintiff about the incident. The plaintiff told him "there was not a problem and that she was just going to continue to do her job and be quiet" (doc. 18-2, Drotleff aff. ¶ 10 & ex. A).

● The following Monday, February 13, 2012, was the plaintiff's first day at the Shakespeare Road facility (*id.*, Drotleff aff., ex. A). The plan was for Ms. Belch to begin training her so that the plaintiff could take over shipping duties at the consumer products warehouse (*id.*, Drotleff aff. ¶¶ 15-21). The plaintiff, however, was reluctant to accept the training offered and told Ms. Belch and Mr. Drotleff that she did not need any training (*id.*, Drotleff aff. ¶ 17). During this same period, Mr. Drotleff also received several complaints about the plaintiff's attitude and that she was being harsh and crude toward co-workers, including Ms. Belch (*id.*, Drotleff aff. ¶ 16). The plaintiff was verbally counseled by Mr. Drotleff (*id.*, Drotleff aff. ¶ 10 & ex. A ). Mr. Drotleff was concerned that the plaintiff's frequent and careless errors would put the Lowes and Wal-Mart business (handled at that warehouse) in jeopardy. For these reasons, when Bridgett Ransom was terminated from the Westmore warehouse, Mr. Drotleff chose to transfer the plaintiff there, "where it was slower, instead of transferring Ms. Belch there, as originally planned." On February 23, 2012, Mr. Drotleff advised the plaintiff that he was going to transfer her to Westmore (doc. 18-2, Drotleff aff. ¶¶ 20-21, 24).

● On February 24, 2012, Sharon Blakeney, a Shakespeare customer services representative in consumer products, reported to Mr. Drotleff that the plaintiff was in the parking lot screaming at her former North Springs team leader, Victor Serna (doc. 18-2, Drotleff aff. ¶ 24 & ex. A; doc. 18-1, Propst aff. ¶ 12). Mr. Serna confirmed that the plaintiff indicated she did not want to work at Westmore (doc. 18-2, Drotleff aff. ¶ 25 & ex. A). On February 27, 2012, Mr. Drotleff spoke with the plaintiff about her unhappiness over being transferred to Westmore and reminded her that she was now in a more "professional setting" and could not be loud and use offensive language as she previously had at North Springs. (doc 18-2, Drotleff aff. ¶ 10 & ex. A).

● On March 1, 2012, the plaintiff caused a customer to be charged a freight shipping charge on a shipment after she had been instructed to use the customer's account number for shipping. The next day, March 2, 2012, she made another shipping error. The customer had ordered 12 of one product, but the plaintiff sent 12 of another product (doc. 18-1, Propst aff. ¶16).

● On March 7, 2012, Trey Jones, the plaintiff's new team leader at Westmore, asked Mr. Drotleff if he could move the plaintiff out of Westmore. Mr. Jones told Mr. Drotleff that plaintiff was difficult to deal with, muttered

things under her breath, and that he had to walk on eggshells around her because he never knew what would cause her to blow up (doc. 18-2, Drotleff aff. ¶ 12 & ex. A).

●The plaintiff made another shipping error on April 4, 2012. In that incident, the customer had ordered 24 of one product, but she shipped 24 of another product (doc. 18-1, Propst aff. ¶ 18).

●On or about April 10, 2012, the defendant received a letter from the plaintiff's counsel who wrote that his client felt she was being subjected to "unlawful work conditions based upon her age and race." Before receiving a second letter from the attorney on or about April 20, Mr. Propst spoke with the plaintiff's counsel who said his client believed she was being paid less than Ms. Belch, the shipping clerk in consumer products. On April 24, 2012, Mr. Propst wrote the plaintiff's counsel a letter advising that the plaintiff and Ms. Belch were being paid at exactly the same hourly rate. Moreover, Mr. Propst reviewed the company's payroll records from 2011 through April 1, 2012, and determined that the plaintiff had actually received more in overtime pay than Ms. Belch in both 2011 and 2012 (doc. 18-1, Propst aff. ¶¶ 19- 21 & ex. A-C).

●On April 13, 2012, the plaintiff switched two orders, and the packing slips were also switched (doc. 18-1, Propst aff. ¶ 22).

● Also on April 13, 2012, Mr. Drotleff wrote the plaintiff a warning for her behavior during a discussion he had with her that day about complaints he had received from the sales department that the plaintiff was not following the shipping instructions they sent her and was not responding to their emails. He spoke to the plaintiff about these complaints and asked her to copy him on all of her email responses. Subsequently, she became loud and defensive, told him "I don't have time for emails," and walked away. As a result of the plaintiff's conduct, Mr. Drotleff wrote her up for her "unacceptable attitude" and told her that her "overall communication to both customer service and other co-workers needs to improve going forward." When she met with him and Nick Propst, the head of human resources, on April 16, 2012, to go over the contents of the April 13th disciplinary form, the plaintiff refused to sign it (doc. 18-2, Drotleff aff. ¶ 29 & ex. C).

● On April 25, 2012, the plaintiff made another shipping error when she invoiced a customer for four clamps the customer had ordered; while the packing slip showed four pieces were shipped, the customer received only three (doc. 18-1, Propst aff. ¶ 22).

●On April 26, 2012, Mr. Drotleff sent the plaintiff an email reminding her of their earlier discussion:

> As we spoke about two weeks ago, I need you to copy me in on emails between shipping and sales. You need to 'reply to all' instead of just replying to the sender. I am

> not seeing an improvement in this area and the communication is still not taking place. Please correct this immediately.

(Doc. 18-2, Drotleff aff. ¶ 30; *see also* doc. 18-3). The plaintiff responded as follows, "YOU KNOW WHAT I AM ANSWERING THE E-MAIL SO NOW YOU WANT THE CC ADDED, FINE" (doc 18-3, pl. dep. ex. 11).

● On May 2, 2012, the plaintiff made another shipping error: the customer's packing slip showed three of a particular product were shipped and that three were on backorder. The invoice for the order also showed three were shipped and three were backordered. However, all six pieces were actually shipped to the customer (doc. 18-1, Propst aff. ¶ 22).

● Also on May 2, 2012, Diane Arvay, who managed orders exported from the United States, complained to Mr. Jones and Mr. Drotleff about the plaintiff, explaining that "every day this week I've received a phone call from either a forwarder and/or UPS (small package) saying they did not have an invoice with their shipment for customs" (doc. 18-5, Arvay aff.¶¶ 4, 8-10 & ex. A).

● On May 3, 2102, Mr. Drotleff met with the plaintiff to go over each of her recent shipping errors to explain how each could have been avoided (doc. 18-2, Drotleff aff. ¶ 31 and ex. A). She indicated she understood what she had done wrong and said she would try to be more careful so these errors would not continue (doc. 18-2, Drotleff aff. ¶ 31 & ex. A).

● On June 18, 2012, Betty Craft, a customer service representative, complained to Mr. Drotleff about a rude email she had received from the plaintiff (doc. 18-3, pl. dep. ex. 14).

● On the afternoon of June 18, 2012, Grady Martin, Marissa Taylor, Mr. Propst, and Mr. Drotleff met with the plaintiff. The purpose of the meeting was to go over a second corrective action writeup based upon several complaints from customers about mistakes the plaintiff made in shipping their orders. The plaintiff was admonished about her lack of professionalism as she dealt with external customers and those with whom she worked. The plaintiff said she meant no harm, but admitted that she could see how her communications could be taken the wrong way. The plaintiff refused to sign the corrective action form (doc. 18-2, Drotleff aff. ¶¶ 24, 33 & ex. A, E; pl. dep. ex. 17).

●On July 24, 2012, the plaintiff made another shipping error when she shipped the wrong product to a customer. The customer had ordered three of the same product, but the plaintiff shipped two of that product and one of a different product (doc. 18-1, Propst aff. ¶ 26).

● On July 26, the plaintiff made four separate shipping errors. One involved her filling a customer's order for one product with another product. The same

5

day she made the same error involving the same products, but for a different customer. Two other orders that day appeared to have gotten their shipping labels switched, so that two customers received each others' orders (doc. 18-1, Propst aff. ¶ 27).

● On July 27, the plaintiff made another shipping error when she shipped five pieces of a product to a customer who had ordered only four (doc. 18-1, Propst aff. ¶ 28).

● It was also on July 27th that the defendant received the charge of discrimination that the plaintiff had filed with the South Carolina Human Affairs Commission on July 16th (doc. 5, amended comp. ¶ 24; doc. 18-1, Propst aff. ¶29 & ex. F).

● During the period from July 26, 2012, until August 3, 2012, the company received over ten complaints from marine customers (for whom the plaintiff handled shipping) that they had received the wrong product (doc. 18-2, Drotleff aff. ¶ 34).

● On August 9, 2012, Mr. Drotleff wrote an email to those in his chain of command that the company had received numerous customer complaints in the last two weeks arising out of marine shipments from the Westmore warehouse. He detailed those errors and noted that all of them were caused by mistakes made by the plaintiff (doc. 18-2, Drotleff aff. ¶ 35 & ex. E).

● On August 20, 2012, Mr. Drotleff wrote on the plaintiff's third and final corrective action form that he had learned of "eight new complaints over the last two to three weeks in Marine." He concluded:

> We have counseled you on your performance on several occasions, but have seen little improvement during the past six months. Due to the numerous errors and lack of attention to detail, we are terminating your employment with [Shakespeare] effective immediately.

(Doc. 18-2, Drotleff aff.¶ 36 & ex. F).

The plaintiff was not replaced, and her former duties as shipping clerk at Westmore have been performed by Trey Jones, her former team leader. Mr. Jones is also African American (doc. 18-1, Propst aff. ¶ 33).

**APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Absent direct evidence of intentional discrimination, Title VII and Section 1981 claims are analyzed under the burden-shifting framework established in *McDonnell Douglas*

7

*Corp. v. Green*, 411 U.S. 792, 793 (1973). *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir.2002) (recognizing that the elements of a discrimination claim are the same under both Title VII and § 1981). Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a). To establish a *prima facie* case of discrimination, a plaintiff must prove that:  (1)  she was in a protected class; (2)  she was performing her job in a satisfactory manner; (3)  the employer took an adverse action against her; and (4)  the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004) (en banc). To establish a *prima facie* case of wage discrimination under Title VII, a plaintiff must show: (1) that she is "a member of a protected class," and (2) "that the job [she] occupied was similar to higher paying jobs occupied by [employees outside the protected class]." *Brinkley–Obu v. Hughes Training*, 36 F.3d 336, 343 (4th Cir.1994).   If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion).  If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

To proceed on a Title VII hostile work environment claim, "a plaintiff must show 'that the offending conduct (1)  was unwelcome, (2)  was based on her [race], (3)  was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4)  was imputable to her employer.'" *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (quoting *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc)).

8

To establish a *prima facie* case of retaliation, a plaintiff must prove that (1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citation omitted).  "If a plaintiff 'puts forth sufficient evidence to establish a *prima facie* case of retaliation' and a defendant 'offers a non-discriminatory explanation' for his termination, the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Id.* (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

"To sufficiently plead a *prima facie* case of wage discrimination under the [Equal Pay Act], a plaintiff must allege: (1) that the employer paid different wages to employees of the opposite sex; (2) that the employees' jobs require equal skill, effort, and responsibility; and (3) that the jobs are performed under similar working environments." *Williams v. Wells*, No. 4:12–2434–RBH, 2013 WL 4042037, at *5 (D.S.C. Aug.8, 2013) (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 613 (4th Cir.1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).

As noted above, the plaintiff failed to respond to the motion for summary judgment and has submitted no evidence in support of her claims.  The undisputed evidence before this court is that after numerous attempts to coach the plaintiff, her job performance had not improved and remained unacceptable. The plaintiff's attitude and communication style continued to be poor, and numerous shipments she had handled incorrectly were creating significant problems with the defendant's customers. Accordingly, as a result of her continued poor performance and inappropriate conduct, the defendant terminated the plaintiff's employment, and her duties were assumed by her former team leader who, like the plaintiff, is African American.  As the plaintiff has failed to demonstrate that specific, material facts exist that give rise to a genuine issue in support of her claims of racial discrimination, summary judgment is appropriate.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the defendant's motion for summary judgment (doc. 18) should be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>United States Magistrate Judge

August 8, 2014
Greenville, South Carolina